UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| _____x | | |
| GARY CHUTE and TERRY MINSHALL, | : | Civil Action No. |
| Individually and On Behalf Of All Others | : | |
| Similarly Situated, | : | |
| | : | |
| Plaintiffs, | : | <u>CLASS ACTION</u> |
| | : | |
| vs. | : | |
| | : | COMPLAINT FOR |
| BLUE APRON HOLDINGS, INC., MATT | : | VIOLATIONS OF THE |
| SALZBERG, BRADLEY DICKERSON, | : | SECURITIES ACT OF 1933 |
| BENJAMIN C. SINGER, JULIE M.B. | : | |
| BRADLEY, TRACEY BRITT COOL, | : | |
| KENNETH A. FOX, ROBERT P. GOODMAN, | : | |
| GARY R. HIRSHBERG and BRIAN P. KELLEY | : | |
| | : | |
| Defendants. | : | |
| _____x | | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs Gary Chute and Terry Minshall ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to their own acts, and upon information and belief, as to all other matters based on the investigation conducted by their counsel, which included a review of, *inter alia*, U.S. Securities and Exchange Commission ("SEC") filings by Blue Apron Holdings, Inc. ("Blue Apron" or the "Company"), press releases and other public statements made by Defendants, media and analyst reports about the Company and other public information. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action on behalf of all persons other than Defendants who purchased or otherwise acquired Blue Apron securities pursuant and/or traceable to the Company's initial public offering ("IPO") on or about June 29, 2017 (the "IPO"), seeking to recover damages caused by Defendants' violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Blue Apron is a subscription-based, meal-kit delivery service founded in 2012. Blue Apron sends weekly boxes of pre-portioned ingredients with instructions for cooking meals at home.

3.      Blue Apron's Class A common stock was offered in the IPO, and thereafter traded on the New York Stock Exchange ("NYSE") under the ticker symbol "APRN."

4.      Blue Apron's IPO was conducted pursuant to a registration statement (the "IPO Registration Statement") and prospectus (the "IPO Prospectus"). In the IPO Registration Statement

and the IPO Prospectus, Defendants made materially false and misleading statements regarding the Company's business and its operational and compliance policies.

5.     In addition, Defendants failed to disclose known material trends that would have a material impact on net sales or revenues or income from continuing operations, and that would cause reported financial information not to be necessarily indicative of future operating results.  In particular, Defendants failed to disclose that by the time of the IPO:

> a.  Blue Apron was experiencing adverse On-Time In-Full ("OTIF") performance at its production facilities;
>
> b.  significant delays had materialized in opening and ramping up production at its Linden, New Jersey facility;
>
> c.  these adverse OTIF rates and delays were hindering the Company's customer retention, and would necessarily delay the Company's announced plans to add new products, which was essential to gaining new customers and competing effectively in the marketplace; and
>
> d.  that as a result of these adverse OTIF rates and delays, Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending until it could address these operational problems and improve its margins and OTIF rates.

6.     On August 10, 2017, in connection with the release of its second quarter earnings, Blue Apron revealed it had encountered significant delays associated with ramping up production in its highly touted new factory in Linden, New Jersey. These pervasive equipment malfunctions and serious staffing issues at this new factory prevented Blue Apron from attaining full production capacity at the Linden facility, which was intended to generate more than half of Blue Apron's total production.

7.     These persistent production delays led to further delays in implementing new product initiatives that Blue Apron had hailed as crucial to customer growth and retention. Production delays also meant that the Company was forced to reduce the amount it spent on

marketing, since it did not make sense to add new customers it could not service. Blue Apron also revealed in August 2017 that it was experiencing poor OTIF rates across its production locations, which threatened Blue Apron's ability to attract and retain customers.

8. Following this news, Blue Apron's share price fell $1.10, or more than 17%, to close at $5.14 per share on August 10, 2017.

9. Blue Apron's stock price continued to slide into November 2017, as additional disclosures revealed to the market the full extent of Blue Apron's pre-existing ongoing production struggles, and the implications they had on Blue Apron's business. By November 7, 2017, Blue Apron's share price had fallen to $3.05, nearly 70% below the IPO price.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and the other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11. The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

12. This Court has subject matter jurisdiction under 28 U.S.C. §1331 and Section 21D of the Securities Act (15 U.S.C. § 77v).

13. Venue is proper in this District under Section 21D of the Securities Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as a significant portion of Defendants' actions took place in this District.

14. In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

3

## PARTIES

15.     Plaintiff Gary Chute purchased Blue Apron securities pursuant and/or traceable to the IPO, and was damaged upon the revelation of the alleged corrective disclosures.

16.     Plaintiff Terry Minshall purchased Blue Apron securities pursuant and/or traceable to the IPO, and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Blue Apron Holdings, Inc. is the issuer in the IPO. Blue Apron Holdings, Inc. was incorporated in Delaware on December 22, 2016 as part of a corporate reorganization whereby Blue Apron, LLC (formerly Blue Apron, Inc.) – which began operations in 2012 – became a wholly-owned subsidiary of Blue Apron Holdings, Inc. Blue Apron Holdings, Inc., and its subsidiaries, are collectively referred to herein as "Blue Apron", or the "Company".

18.     At the time of the IPO, Blue Apron maintained principal executive offices at 5 Crosby Street, New York, New York 10013. At all relevant times since approximately October 2017, Blue Apron has maintained its principal executive offices at 40 West 23rd Street, New York, New York. Blue Apron's shares trade on the NYSE under the ticker symbol "APRN."

19.     Defendant Matt Salzberg ("Salzberg") is a co-founder of Blue Apron and served as its President and Chief Executive Officer ("CEO") until November 2017, when he resigned as CEO and became executive chairman. He also has been a director of the Company since its inception. Salzberg participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

20.     Defendant Bradley Dickerson ("Dickerson") is currently Blue Apron's President and Chief Executive Officer. Dickerson joined the Company in February 2016, and has served as President and CEO since November 2017, when he replaced Salzberg. Dickerson participated in

preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

21.     Defendant Benjamin C. Singer ("Singer") served at all relevant times as the Company's Secretary and general counsel. Singer participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

22.     Defendant Julie M.B. Bradley ("Bradley") has been a Director of Blue Apron since November 2015, and is a member of the audit committee and compensation committee. Bradley participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

23.     Defendant Tracy Britt Cool ("Cool") has been a Director of Blue Apron since January 2017, and is a member of its audit committee and nominating and corporate governance committee. Cool participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

24.     Defendant Kenneth A. Fox ("Fox") has been a Director of Blue Apron since April 2014, and is a member of its audit committee. Fox participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

25.     Defendant Robert P. Goodman ("Goodman") has been a Director of Blue Apron's Board since November 2015, and is a member of the compensation committee. Goodman participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

26.     Defendant Gary R. Hirshberg ("Hirshberg") has been a Director of Blue Apron's Board since October 2016, and is a member of its compensation committee and nominating and

corporate governance committee. Hirshberg participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

27.     Defendant Brian P. Kelley ("Kelley") has been a Director of Blue Apron's Board since April 2017, and is a member of the nominating and corporate governance committee. Kelley participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

28.     The Defendants referenced above in ¶¶ 19-27 are sometimes referred to herein as the "Individual Defendants."

## BACKGROUND

29.     Blue Apron is a subscription-based, meal-kit delivery service founded in 2012.

30.     Blue Apron's meal kits are available to customers through a weekly subscription service. Every week, the Company creates a number of recipes and customers select which recipes they want to receive. The Company delivers meal kits containing the recipes, along with pre-portioned ingredients required to cook them.

31.     Blue Apron has grown exponentially since its 2012 founding. By August 2013, the Company was delivering 100,000 meals per month. That number rose to 500,000 by March 2014; to 1 million by November 2014; to 3 million by June 2015, when the Company began shipping to the entire contiguous United States; to 5 million by October 2015; and to 8 million by October 2016.

32.     To grow this quickly, the Company has spent aggressively and scaled its operations upwardly very rapidly. It opened a fulfillment center in early 2014 in Richmond, California; another fulfillment center, ten times as large, in December 2014 in Jersey City, New Jersey; and a third fulfillment center in June 2015 in Arlington, Texas.

33.     In 2016, Blue Apron started building new fulfillment centers in Linden, New Jersey and Fairfield, California. Blue Apron announced these two new fulfillment centers in a press release on February 6, 2017, which stated that the Company was "expanding its fulfillment operations in New Jersey with the opening of a new 495,000 square foot fulfillment center in Linden," explaining as follows:

> We're excited to be expanding our presence in New Jersey and bringing full- time jobs to the Linden community. Our new fulfillment center will help improve the efficiency and capacity of our operations to meet strong customer demand," said Matt Salzberg, Blue Apron co-founder and CEO.
>
> The Linden facility will be outfitted with state-of-the-art technology and a variety of employee amenities. The fulfillment center is currently under construction and is slated to officially open for production later this year.

34.     On March 31, 2017, Blue Apron filed a draft registration statement and preliminary prospectus. The registration statement was subsequently amended several times.

35.     In the Company's amended preliminary prospectus, filed on June 19, 2017, the Company was marketing 30 million shares, and "estimated that the initial public offering price per share will be between $15.00 and $17.00." This would have raised $450–$510 million, and valued the Company at approximately $3.2 billion. Investors were not enthusiastic, however, and the Company had to reduce its offering price to $10 per share.

36.     The final amended registration statement was filed and declared effective on June 28, 2017 (collectively, the "IPO Registration Statement"). The final prospectus (the "IPO Prospectus") was filed on June 29, 2017.

37.     On July 5, 2017, Blue Apron completed its IPO, selling 30 million shares of Class A common stock at $10.00 per share. The Company received approximately $278 million in net proceeds from this IPO.

38.     Unbeknownst to the investing public, however, Blue Apron was struggling with operational issues far beyond what investors were being told at the time of the IPO.  Blue Apron's rapid growth had created significant problems that forced Blue Apron to slow its growth and limit its marketing efforts until it could address its operations problems.  Blue Apron also continued scaling its operations upward and trying to develop more advanced manufacturing capabilities that would allow it to offer more flexible product offerings.

### FALSE AND MISLEADING STATEMENTS IN THE IPO DOCUMENTS

39.     The IPO Registration Statement and IPO Prospectus were materially false and misleading in that they failed to "provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations", and to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," as mandated by Item 303 of Regulation S-K (17 C.F.R. §229.303), and the SEC's related interpretive releases thereto.

40.     The Instructions to Item 303 further require that the Management's Discussion and Analysis of Financial Condition and Results of Operations "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

41.     In violation of this requirement, Defendants failed to disclose known material trends that would have a material impact on net sales or revenues or income from continuing operations, and that would cause reported financial information not to be necessarily indicative of future operating results, including that:

a.  Blue Apron was experiencing adverse OTIF performance at its production facilities;

b.  significant delays already had materialized in opening and ramping up production at its Linden, New Jersey facility;

c.  these adverse OTIF rates and delays were hindering the Company's customer retention and would necessarily delay the Company's announced plans to add new products, which was essential to gaining new customers and competing effectively in the marketplace; and

d.  that as a result of these adverse OTIF rates and delays, Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending until it could address these operational problems and improve its margins and OTIF rates.

42.  Instead, the IPO Prospectus claimed the Company's value proposition for stockholders had three components: "Scale and Growth," "Attractive and improving margins," and "Unit economics".  The IPO Prospectus also falsely claimed that, "[a]s we have continued to scale our business, grow our direct supplier relationships, and introduce increased automation into our fulfillment centers, we have become more cost efficient."

43.  With respect to the Company's fulfillment centers, the IPO Prospectus stated:

We are completing the build out of a new fulfillment center in Linden, New Jersey, which we have recently begun to utilize, and have entered into a lease for another new fulfillment center in Fairfield, California, which is currently under construction. Upon completion of the build out, the new fulfillment center in Linden, New Jersey will occupy approximately 495,000 square feet of space pursuant to a lease expiring in August 2026 with an option to extend the term for two consecutive five-year periods. The new fulfillment center in Fairfield, California will occupy approximately 431,000 square feet of space pursuant to a lease expiring 126 months after the commencement date, which expiration is currently estimated to be in early 2028, with an option to extend the term for two consecutive five-year periods. Upon completion of our new fulfillment centers in Linden, New Jersey and Fairfield, California, we anticipate that such fulfillment centers, together with our Arlington, Texas fulfillment center, will comprise our primary fulfillment operations for the foreseeable future.

44.     This statement was false and misleading because it discussed the progress of construction at the Linden fulfillment center, and claimed that the Company had "recently begun to utilize" it, creating the misimpression that construction and operational improvements at Linden were proceeding on schedule, but failed to disclose that Blue Apron was already experiencing adverse OTIF rates, and significant delays had already materialized in opening and ramping up production at the Linden facility.

45.     The IPO Prospectus also stated:

> If we do not have sufficient fulfillment capacity or experience problems or delays in fulfilling orders, our customers may experience delays in receiving their meal deliveries, which could harm our reputation and our customer relationships and could materially adversely affect our business, financial condition and operating results.
>
> ***
>
> We have designed and built our own fulfillment center infrastructure, including customizing third-party inventory and package handling software systems, which is tailored to meet the specific needs of our business. Furthermore, we are expanding the use of automated production equipment and processes in our existing fulfillment centers and are incorporating automated production equipment and processes into our new Linden, New Jersey fulfillment center that we are in the process of building out. As we continue to add capacity, capabilities and automated production equipment and processes to our fulfillment centers, our fulfillment operations will become increasingly complex and challenging. Any failure to hire, train or retain employees capable of operating our fulfillment centers could materially adversely affect our business, financial condition and operating results. We also may be unable to procure and implement automated production equipment and processes on a timely basis, and they may not operate as intended or achieve anticipated cost efficiencies. For example, suppliers could miss their equipment delivery schedules, new production lines and operations could improve less rapidly than expected, or not at all, the equipment or processes could require longer design time than anticipated or redesigning after installation, and new production technology may involve equipment and processes with which we are

not fully experienced. Difficulties we experience in automating our fulfillment processes could impair our ability to reduce costs and could materially adversely affect our business, financial condition and operating results.

46. The IPO Prospectus also stated:

Developing and launching new product offerings or enhancements to our existing product offerings involves significant risks and uncertainties, including risks related to the reception of such product offerings by our existing and potential future customers, increases in operational complexity, unanticipated delays or challenges in implementing such offerings or enhancements, increased strain on our operational and internal resources (including an impairment of our ability to accurately forecast demand and related supply) and negative publicity in the event such new or enhanced product offerings are perceived to be unsuccessful. We have scaled our business rapidly, and significant new initiatives have in the past resulted in, and in the future may result in, operational challenges affecting our business.

47. These statements were false and misleading because they portrayed these risks as purely hypothetical, but failed to disclose that:

a. Blue Apron was already experiencing adverse OTIF rates;

b. significant delays had already materialized in opening and ramping up production at the Linden facility; and

c. as a result, the specified risks such as "problems or delays in fulfilling orders" and "operational challenges" and a failure to "achieve anticipated cost efficiencies" had already materialized and were, in fact, "materially adversely affect[ing] our business," not merely "in the past" but also at present and continuing into the foreseeable future.

48. The IPO Prospectus stated that Blue Apron was focused on launching its new Linden fulfillment center, and on launching its planned product expansion, and that it therefore expected operating expenses to decrease in the second quarter of 2017:

In the second quarter of 2017, we expect to invest significantly less in marketing compared to the first quarter of 2017 due to the seasonal factors discussed above, the ongoing operational effort

associated with launching our new fulfillment center in Linden, New Jersey, and our planned product expansion to offer greater flexibility in recipes. As a result, while we expect significant year- over-year net revenue growth from the second quarter of 2016 to the second quarter of 2017, we anticipate that our quarterly net revenue in the second quarter of 2017 will be modestly lower than the seasonally high level of net revenue in the first quarter of 2017, which decline will be more than offset by a reduction in our operating expenses, including a significant planned reduction in our marketing expenses due to our seasonal marketing strategies.

49.     This statement was false and misleading because it discussed the Company's "ongoing operational effort associated with launching our new fulfillment center in Linden, New Jersey, and our planned product expansion to offer greater flexibility in recipes", but failed to disclose that:

    a.  Blue Apron was already experiencing adverse OTIF rates;

    b.  significant delays had already materialized in opening and ramping up production at the Linden facility;

    c.  the already-materialized adverse OTIF rates and delays at Linden would necessarily delay the Company's "planned product expansion"; and

    d.  because of the already-materialized adverse OTIF rates and delays at Linden, Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending—not merely as part of "seasonal marketing strategies" but because it needed to address these already materialized operational problems.

50.     The IPO Prospectus stated that part of Blue Apron's growth strategy was to "expand our core product to fit more lifestyles," explaining as follows:

As we expand our operational capabilities, increase the automation in our fulfillment centers, and grow our supplier network, we plan to expand our core product by offering greater flexibility in the number of recipes per order and greater diversity in the number of recipes from which customers may choose. In the future, we may introduce similar flexibility for wine. We are developing product

> expansion initiatives to fit the lifestyles of a broader customer set in
> order to continue to expand our addressable market and drive greater
> satisfaction among current customers, thereby increasing their
> Average Order Value and rate of Repeat Orders.

51.     This statement was false and misleading because Defendants claimed that the
Company was "expand[ing] our operational capabilities" and "developing product expansion
initiatives", but failed to disclose that:

    a.  Blue Apron's operational capabilities were actually worsening because the
Company was already experiencing adverse OTIF rates;

    b.  significant delays had already materialized in opening and ramping up
production at the Linden facility; and

    c.  the adverse OTIF rates and delays at Linden, which already had materialized,
necessarily would delay the Company's "product expansion initiatives."

52.     The IPO Prospectus also stated that Blue Apron was already in the process of
introducing new products, which would help increase the Company's sales and profits:

> We are currently in the process of introducing additional product
> expansions to increase both customer flexibility (the ability to select
> greater or fewer recipes per Order) and the number of recipe options
> (the ability to choose from a greater number of recipes each week).
> We expect that this product expansion will favorably impact our
> cumulative net revenue per Customer.

53.     This statement was false and misleading because the already-materialized adverse
OTIF rates and delays at Linden were necessarily delaying any "additional product expansions,"
and therefore Defendants had no reasonable basis to "expect that this product expansion will
favorably impact our cumulative net revenue per Customer" until after the OTIF rates and delays
at Linden could be addressed.

54.     With respect to the Company's ability to fulfill orders and achieve operational
efficiencies, the IPO Prospectus stated as follows:

> Our strategic investments in our fulfillment center operations will
> significantly impact our ability to continue to grow our business,
> introduce new products, increase variety to customers, and create
> efficiencies in our cost structure. We have made significant
> investments to scale our operations and support the growth of our
> business, and we plan to continue this investment. In the near term,
> we plan to further invest in equipping our fulfillment centers with
> automated portioning and packaging equipment, which we believe
> will increase our operational efficiency.

55.     This statement was false and misleading because it stated that the Company had

invested in "automated portioning and packaging equipment", and suggested that the Company

therefore had a reasonable basis to believe that "further" investments would "increase our

operational efficiency", but it failed to disclose that:

    a.  Blue Apron's operational efficiency was actually worsening because the
        Company was already experiencing adverse OTIF rates as well as significant
        delays in opening and ramping up production at the Linden facility; and

    b.  Defendants therefore had no reasonable basis to project that the Company's
        operational efficiency would increase in the near term.

### THE TRUTH BEGINS TO EMERGE

56.     On August 10, 2017, Blue Apron announced its results for the second quarter of

2017, issuing a press release, holding an earnings call, and filing its quarterly report on Form 10-

Q for the quarter ended June 30, 2017.  This announcement shocked investors by revealing that

Blue Apron's highly touted new fulfillment center in Linden, New Jersey, which, according to the

IPO Prospectus, was supposed to be "outfitted with state-of-the-art technology" and "help improve

the efficiency and capacity of our operations to meet strong customer demand," had run into

"unexpected complexities and costs . . . . which are adversely affecting our revenue expectations,

the rollout of our new product offerings, and our ability to acquire and retain new customers."

57.     In discussing these results, Defendant Salzberg revealed the following on the earnings call:

> Another factor that impacted the second quarter was the timing of our product expansion. As you know, we are currently in the process of rolling out significant changes to our infrastructure both from an operational and technological perspective to allow us to offer a more diverse and personalized product assortment to our customers. The reality is, we are behind on this work and that delay impacted our second quarter results as well as our near-term outlook, which Brad will review shortly.
>
> Much of the delay is related to the launch of our Linden fulfillment center, the newest and most automated facility in our network. Linden shipped its first delivery on May 15th, but in the second quarter still only represented approximately 3% of our network's national volume. As we have moved into the third quarter, we are transitioning more volume from our older Jersey City center to Linden, and Linden will represent a larger percentage of our national volume in the back half of the year. During this ramp phase, Linden will be operating at a significantly worse margin than our other centers; however, we still believe that Linden will ultimately become our most efficient center when fully scaled.
>
> The delay is related to experiencing greater operational complexity than we initially planned for.

58.     Defendant Salzberg also revealed that the Company's OTIF rates had been worsening:

> [We are seeing worse OTIF rates] which impacts – and OTIF, since we haven't used that metric a lot publicly, just so you guys know is on-time in full, and the way we think about that, it's about delivering on-time to the customer, and by in full we mean 100% order completeness.
>
> So, a missing ingredient would impact, a mis-pick would impact that, and that's actually one of the biggest challenges right now on our OTIF rates, because so much of the process in our fulfillment centers is brand new and the change management associated with

training thousands of employees and managers on the new process and getting process compliance is just taking us a little bit longer than we had previously anticipated. This is the most ambitious organizational change we've made. So, when those OTIF rates are suffering, they also impact the order frequency and cadence of those new customers as well. And so, one of the reasons that we are choosing to pull back on marketing in the back half of the year is because we are focused on only generating incredible returns on our marketing and when we see drivers in that equation move, we act in terms of managing the business as rapidly as we can, and so that's the impact there.

59.     In response to an analyst question, Defendant Salzberg ultimately admitted that the

OTIF problems were not limited to Linden:

So we have seen impact on our OTIF rates across all of our centers because of the roll out of our new infrastructure. That being said, it is most pronounced in Linden, which is just very newly being ramped right now and it is the most automated and advanced center with the most new people and infrastructure. So there is more impact in Linden then there is in the rest of the country.

60.     Defendant Salzberg further admitted during the earnings call that the OTIF metric

was incredibly important to the Company's business:

We are hyper-focused on maintaining strong performance on metrics like on- time in-full, or OTIF, to ensure seamless customer experiences and will be more deliberate in expanding our offerings to customers with the current performance levels. We know lower than average OTIF scores directly impact our customer lifetime values, especially for customers early in their lifecycle with us, and we have seen some impact as part of this rollout. Since margins and OTIF are both drivers of customer lifetime value, when they are impacted it affects the returns on our acquisition marketing as well. The interconnectedness of these drivers ultimately flows through to growth and financial performance.

61.     As Defendant Dickerson further elaborated:

[T]he delays that we've been having in our product expansion are impacting our ability on the acquisition side to drive incremental revenue through new customers because obviously those offerings are very, very important to attract new customers, as Matt had talked about. So, that is part of the impact.

Obviously the challenges in rolling out our product offerings, specifically challenges in rolling out the Linden facility impacting our OTIF rates also causes some short term concerns with our customer engagement and retention. Specifically, as Matt mentioned, in newer customers also. That is obviously part of the back half of the year guidance….

***

It's really hard to kind of separate how much of this was due to the delay in rollout and the impact of OTIF rates versus the pullback in marketing to some degree, because they're all kind of interconnected to some degree, but I would say that they probably all play a relatively important part of this revenue guidance in the back half of the year with the marketing call down probably, I would say, being the most significant piece of it, but I don't want to understate the impact of the delay in rolling out our product expansion and also the OTIF rates, which are very, very important.

62.     Due in part to the Linden delays, and the broader OTIF problems, Blue Apron's revenues and customer numbers actually declined.  In the first quarter of 2017, Blue Apron had 1.04 million customers, 4.3 million orders, and $244.1 million in revenue.  In the second quarter, however, it had only 943,000 customers, 4.0 million orders, and $238.1 million in revenue.

63.     Defendants knew these operational challenges and associated expenses would become worse in the third quarter of 2017. According to Defendant Dickerson, the "majority of the operational pressure is expected in the third quarter as we fully transition from our existing Jersey City center to our new Linden center and increase the velocity of our current product expansion efforts nationally across all our fulfillment centers." Blue Apron's Form 10-Q for

17

second quarter of 2017 confirmed this, stating that Blue Apron "expect[ed] increased expenses driven by the ongoing launch of new infrastructure to support our product expansion initiatives, including the launch of our new Linden, New Jersey fulfillment center, to continue throughout the remainder of 2017."

64.     Moreover, Defendant Dickerson stated during the earnings call that Blue Apron had been forced to change its "strategic approach in managing the business for the remainder of 2017," stating as follows:

> As Matt mentioned earlier, we are working through unexpected complexities and costs that have arisen with the ongoing launch of our Linden facility as well as our current product expansion initiatives. These complexities have arisen within the last month as we continue to transfer more and more volume from our existing center in Jersey City to our new center in Linden. Currently, our Linden center is approaching the volumes of our other existing centers compared to minimal volume in the second quarter.
>
> In addition to the significant impact to our near-term labor costs included in cost of goods sold, these issues are also having a meaningful impact to our revenue expectations as the delays in rolling out our new product offerings create headwinds to acquisition of new customers and challenges around on- time in full rates impact retention of newer customers. This recent operational development and its expected near-term effect on net revenue and cost of goods sold, in addition to the smaller raise of capital in our IPO than originally anticipated, has changed our strategic approach in managing the business for the remainder of 2017.
>
> As Matt mentioned, the interconnectedness of cost of goods sold and on-time in- full and their effects on marketing efficiency are important drivers of financial performance. Because of these factors, we will be reducing our marketing spend in the back half of the year which will in turn have an obvious additional impact to the company's top-line growth.

65.     Defendant Salzberg summarized how the Linden delays and broader OTIF problems had forced Blue Apron to change its strategic approach, stating as follows:

> the launch of Linden, in particular, has caused our on-time in full rates to be lower than where we are comfortable with, which is why we are delaying some of that launch and taking it a little more deliberately because we're focused on making sure that all of our customers have seamless customer experiences. And so when our OTIF rates are worse than we would like, it does impact early customer lifecycle, lifetime value somewhat, and that is one of the reasons why we are being more conservative on acquiring customers during this back half of the year while we are working through completing the launch in a high quality way so that all of our customers always get an incredible experience from Blue Apron.

66.     The factors Defendants Dickerson and Salzberg cited as chief reasons for changing Blue Apron's strategic approach, adverse OTIF rates and persistent delays in opening and ramping up the Linden facility, both were present at the time of the IPO.  As such, the Company must have changed its strategic approach when it was experiencing the OTIF issues and Linden delays leading up to the IPO, not just in August when the Company first revealed the ongoing issues.

67.     As a result of the change in strategic approach, Blue Apron had to issue guidance for the remainder of the year significantly below what analysts and the market had been led to expect.  Blue Apron now expected between $380-400 million in revenue, and a net loss of $121-128 million, in the second half of 2017. In the IPO Prospectus, Blue Apron had stated that its "projected remaining capital expenditures are expected to amount to approximately $100.0 million to $180.0 million in the aggregate for 2017 and 2018." During the earnings call, however, Defendant Salzberg disclosed that it had decreased to $75 million to $115 million, in part, because given the problems with OTIF, the delays at Linden, and the lack of growth in customers, Blue Apron no longer saw an urgent need to complete its planned new fulfillment center in Fairfield, California.

68.     Blue Apron stock dropped $1.10 per share, or over 17%, to close at $5.14 per share on August 10, 2017, a 50% drop from the IPO price.

69.     On October 18, 2017, Blue Apron filed a Form 8-K with the SEC, and announced that it had eliminated 6% of its workforce in a "company-wide realignment of personnel to support its strategic priorities." According to Defendant Salzberg, the layoffs "flowed from the roadmapping and reprioritization exercise that we recently undertook[.]"

70.     On November 2, 2017, Blue Apron announced its results for the third quarter of 2017, issuing a press release, holding an earnings call, and filing its quarterly report on Form 10-Q for the quarter ended September 30, 2017. Among other things, Blue Apron reported that it had completed its most recent product expansion, and fully transitioned product volumes to its newly launched east coast fulfillment center in Linden, New Jersey, and that it had decided not to build out its planned fulfillment center in Fairfield, California.

71.     Blue Apron's stock price plummeted 18.6%, from $4.67 per share on November 1, 2017 to close at $3.80 per share on November 2, 2017.

72.     By November 29, 2017, Blue Apron stock had dropped below $3 per share—70% below its IPO price.

73.     On November 30, 2017, after the market closed, Blue Apron announced that Defendant Salzberg had stepped down from his role as President and CEO, and that Defendant Dickerson had taken his place.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action as a class action under CPLR §§901(a) and 902, individually and on behalf of all those who purchased or otherwise acquired Blue Apron securities

pursuant and/or traceable to the IPO. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

75.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Blue Apron securities were actively traded on the NYSE. While the exact number of Class members is unknown at this time, and can be ascertained only through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Blue Apron, or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

76.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

77.     Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

78.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.  Whether Defendants violated the Securities Act;

      b.  Whether Defendants participated in and pursued the wrongful activities complained of herein;

c.  Whether the Prospectus and Registration Statement issued in connection with the IPO were materially false and misleading, or omitted to state material facts about Blue Apron;

d.  Whether Defendants acted with due care in misrepresenting or omitting to state material information concerning Blue Apron; and

e.  The extent of damages sustained by members of the Class, and the appropriate measure of damages.

79.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

80.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

81.  The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. There will be no difficulty in managing this action as a class action.

## COUNT I

### For Violation of Section 11 of the Securities Act
### Against All Defendants

82.  Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

83. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

84. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

85. Blue Apron is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

86. As issuer of the shares, Blue Apron is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

87. None of the Individual Defendants named herein made a reasonable investigation, or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

88. By reasons of the conduct herein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

89. Plaintiffs acquired Blue Apron securities pursuant and/or traceable to the Registration Statement for the IPO.

90. Plaintiffs and the Class have sustained damages. The value of Blue Apron securities has declined substantially due to Defendants' violations.

### COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

91. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

92.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), on behalf of the Class, against all defendants.

93.     This Count does not sound in fraud.  Plaintiffs do not allege that the Individual Defendants had scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

94.     By means of the defective Prospectus, Defendants were sellers and offerors and/or solicitors of purchasers of Blue Apron common stock to Plaintiffs and the other members of the Class for the benefit of themselves and their associates.

95.     The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiffs and the other members of the Class who purchased or acquired Blue Apron shares pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true, and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

96.     Plaintiffs did not know, nor in the exercise of reasonable due diligence could have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs acquired Blue Apron shares.

97.     Less than one year has elapsed between the time that plaintiff discovered, or reasonably could have discovered, the facts upon which this claim is based, and the time that plaintiff filed this allegation of violations of §12(a)(2) of the Securities Act. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this claim.

98. By reason of the conduct alleged herein, defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased or acquired Blue Apron shares pursuant to the Prospectus, sustained substantial damages.

99. Accordingly, Plaintiffs and the other members of the Class who hold the Blue Apron shares issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the Defendants sued herein. Class members who have sold their shares seek damages to the extent permitted by law.

## COUNT III

### For Violation of Section 15 of the Securities Act
### Against the Individual Defendants

100. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

101. Individual Defendants, by virtue of their offices, directorships, and specific acts, were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons of Blue Apron within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence, and exercised the same, to cause Blue Apron to engage in the acts described herein.

102. Individual Defendants' positions made them privy to, and provided them with, actual knowledge of the material facts concealed from Plaintiffs and the Class.

103. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs and the Class for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiffs as Class Representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs, and the other members of the Class, prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 2, 2020                         **LAW OFFICES OF CURTIS V. TRINKO**


By:_____/s/ *Curtis V. Trinko*_____

CURTIS V. TRINKO, Esq.

39 Sintsink Drive West, 1st Floor
Port Washington, New York 11050
Telephone: (212) 490-9550
Facsimile: (212) 986-0159
ctrinko@trinko.com


**HOLZER & HOLZER LLC**
COREY D. HOLZER, Esq.
MARSHALL P. DEES, Esq.
LUKE R. KENNEDY, Esq.
1200 Ashwood Parkway, Suite 410

Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com
lkennedy@holzerlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.      I, Gary Chute, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Blue Apron Holdings, Inc. ("Blue Apron" or the "Company") and authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3.      I did not purchase or acquire Blue Apron securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Blue Apron securities in or traceable to the Company's public offering conducted on or around June 29, 2017 (the "IPO"), including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      To the best of my current knowledge, the attached sheet lists all of my transactions in Blue Apron securities in or traceable to the IPO.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury that the foregoing is true and correct.


**Executed** _September 17, 2020_
                    **(Date)**


DocuSigned by:

_Gary Chute_
_____
8D0FE628253547F...
        **(Signature)**


Gary Chute
_____
        **(Type or Print Name)**

DocuSign Envelope ID: 6CFBE06C-3184-4A61-B1D7-64B6754AF18A

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 06/29/2017 | Purchase | 700 | $10.16 |
| 06/29/2017 | Purchase | 1000 | $10.00 |
| 06/30/2017 | Purchase | 300 | $9.45 |
| 06/30/2017 | Purchase | 300 | $9.40 |
| 07/05/2017 | Purchase | 300 | $9.20 |
| 07/05/2017 | Purchase | 500 | $8.88 |
| 07/06/2017 | Purchase | 1000 | $8.50 |
| 07/06/2017 | Purchase | 500 | $8.16 |
| 07/11/2017 | Purchase | 400 | $7.55 |
| 07/25/2017 | Purchase | 1000 | $7.30 |
| 07/25/2017 | Purchase | 1000 | $7.26 |
| 07/26/2017 | Purchase | 800 | $7.00 |
| 07/26/2017 | Purchase | 1300 | $6.99 |
| 07/26/2017 | Purchase | 900 | $6.87 |
| 07/26/2017 | Purchase | 1000 | $6.80 |
| 08/01/2017 | Purchase | 650 | $6.40 |
| 08/02/2017 | Purchase | 750 | $6.19 |
| 08/04/2017 | Purchase | 1000 | $5.80 |
| 08/10/2017 | Purchase | 2000 | $5.50 |
| 08/16/2017 | Purchase | 600 | $5.51 |

DocuSign Envelope ID: 6CFBE06C-3184-4A61-B1D7-64B6754AF18A

Name: _____Gary Chute_____

Address: _____1701 Duke St., Apt. 100_____

City ___Alexandria_____ State___VA___ Postal Code ___22314____

Phone: ____(703) 371-9926_____

Email: ____gchuterealty@gmail.com_____

Profession: ___Real Estate Professional_____

THIS PAGE MUST BE COMPLETED

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.      I, Terry Minshall, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Blue Apron Holdings, Inc. ("Blue Apron" or the "Company") and authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3.      I did not purchase or acquire Blue Apron securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Blue Apron securities in or traceable to the Company's public offering conducted on or around June 29, 2017 (the "IPO"), including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      To the best of my current knowledge, the attached sheet lists all of my transactions in Blue Apron securities in or traceable to the IPO.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed ___September 17, 2020_____

**(Date)**

DocuSigned by:

*Terry Minshall*

9865E14A18564ZA...

_____

**(Signature)**

Terry Minshall

_____

**(Type or Print Name)**

DocuSign Envelope ID: 6681D334-373B-4C80-8D30-01620008BCD1

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 06/29/2017 | Purchase | 100 | $10.00 |

Name: Terry Minshall

Address: 276 Hillcrest Ave

City Troy State NY Postal Code 12180

Phone: (518) 487-9919

Email: blueapron@terryminshall.com

Profession: Distributed Technology Leader

THIS PAGE MUST BE COMPLETED